IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DR. KEITH BELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-01157-P |
| | § | |
| EAGLE MOUNTAIN SAGINAW INDEPENDENT SCHOOL DISTRICT, | § § § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Before the Court is Defendant Eagle Mountain-Saginaw Independent School District's ("Eagle Mountain") Motion to Dismiss for Failure to State a Claim ("MTD" or "Motion"). ECF No. 9. Having considered the Motion, Plaintiff Dr. Keith Bell's ("Bell") Response (ECF No. 13), and Eagle Mountain's Reply (ECF No. 15), the Court finds that the Motion should be and hereby is **GRANTED.**

## THE TITLE CARD

Today's bout is only one of the latest in a long string of fights involving Dr. Keith Bell. In one corner stands the underdog, Eagle Mountain—a scrappy, counter-punching independent school district. In the other stands Bell, an infamous slugger known in federal courts around the United States for throwing heavy-handed hooks at non-profits and taxpayer funded school districts in the hopes that they throw in the towel and let him take the purse. In refereeing today's match, the Court finds itself in the frustratingly familiar

position of penalizing rabbit-punches and kidney shots between parties who, by all reasonable accounts, should not be in the ring at all.

## WARMING UP[1]

**A.     Bell challenges Eagle Mountain to a fight.**

Bell is a sports psychology and performance consultant who authored ten books and over eighty articles on these subjects. Comp., ECF No. 1, at ¶¶ 7, 9. One of these books is WINNING ISN'T NORMAL, a 72-page work that Bell wrote in 1982 and copyrighted. *Id*. at ¶ 11. Bell creates, markets, and sells works derived from this book, including posters and t-shirts that display a particular passage known as the "WIN Passage." *Id.* at ¶ 13. Bell views the WIN Passage as the heart of his work, registered the passage for copyright in 2017, and offers licenses to publish or otherwise use it. *Id*. at ¶¶ 14, 17. Bell also obtained a federally registered trademark for the phrase "WINNING ISN'T NORMAL," which he uses in connection with several goods and services, including his Winning Isn't Normal series of books, of which WINNING ISN'T NORMAL is part. *Id*. at ¶ 19.

Eagle Mountain is a public independent school district located in Tarrant County, Texas. *Id*. at ¶ 22. CTHS Softball and CTHS Color Guard are the official Twitter pages for the Chisholm Trail High School ("CTHS") Softball team and Color Guard, respectively. *Id*. at ¶¶ 23–24. CTHS is part of Eagle Mountain. *Id*.

---

[1]Unless otherwise noted, the facts in this section are taken from Plaintiff's Complaint (ECF No. 1), as the Court must take all uncontroverted allegations as true. *See Abramov v. Otis Elevator Co.*, No. 3:11-CV-440-D, 2011 WL 5081560, at *2 (N.D. Tex. Oct. 25, 2011) (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (per curiam)).

Both CTHS Softball and Color Guard displayed the WIN Passage on their Twitter pages beginning on December 9, 2017. *Id.* at ¶¶ 25–26. The pages published the WIN Passage without contacting Bell to request permission to do so. *Id.* at ¶ 31. Bell discovered the allegedly infringing posts on December 29, 2017, and February 6, 2018, respectively. *Id.* at ¶¶ 25–26. Bell contacted Eagle Mountain on November 25, 2018, claiming that the WIN Passage was not properly attributed to him. *Id.* at ¶ 28. Attempting to avoid a pugilistic event, Eagle Mountain promptly removed both posts, informed Bell that the incident would be a "teachable moment," and that Eagle Mountain was developing training to prevent future incidence. *Id.* at ¶ 29. The parties discussed settlement multiple times between 2018 to 2020 with no success. *Id.* at ¶ 30.

**B.     The boxers touch gloves and go to their corners.**

Eagle Mountain was ultimately unable to prevent the fight and Bell filed suit against it alleging direct, vicarious, and contributory copyright infringement alongside a request for declaratory judgment. *See* Comp. Eagle Mountain filed the MTD, Bell responded, and Eagle Mountain replied. ECF Nos. 9, 13, 15. The MTD is now ripe for consideration.

## RULES OF THE RING: THE 12(b)(6) STANDARD

Federal Rule of Civil Procedure 8(a) requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If a plaintiff fails to satisfy Rule 8(a), the defendant may file a motion to dismiss the plaintiff's

3

claims under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6).

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

"Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757,

763 (5th Cir. 2011) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court may also consider documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

## THE BELL RINGS, THE BOUT BEGINS

Bell expressly abandoned his declaratory judgment claim, so the Court will not address it. Resp. at ¶ 35. The Court begins with direct copyright infringement.

**A.      Bell heaves a heavy-handed hook.**

To prove copyright infringement, a plaintiff must show (1) "ownership of a valid copyright" and (2) "copying" by the defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). "Copyright ownership is shown by proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities." *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994). One such statutory formality is registration. *See* 17 U.S.C. § 410(c). "A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) (per curiam).

Once the plaintiff shows ownership of a valid copyright, he must next prove that the defendant unlawfully appropriated protected portions of the copyrighted work. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 832 (10th Cir. 1993). This question involves two separate inquiries: (1) whether the defendant, as a factual matter, copied

5

portions of the plaintiff's program and (2) whether, as a mixed issue of fact and law, those elements of the copied program are protected expression and of such importance to the copied work that the appropriation is actionable. *Id*. "The fair use doctrine comes under the second prong of determining whether the appropriation of the copied work is actionable." *Bell v. Magna Times*, *LLC*, No. 2:18-CV-497-DAK, 2019 WL 1896579, at *2 (D. Utah Apr. 29, 2019).

Under the Copyright Act, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. The Copyright Act then lists four factors a court must consider in determining whether a particular use is a "fair use":

1. the purpose and character of the use, including whether such use is of commercial nature or is for nonprofit education purposes;

2. the nature of the copyrighted work;

3. the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4. the effect of the use upon the potential market for or value of the copyrighted work.

*Id*. The factors enumerated in the section are not meant to be exclusive: "[S]ince the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts." *Harper & Row Publishers, Inc. v. Nation Enters*., 471 U.S. 539, 560 (1985). In considering the fair use doctrine on a case-by-case basis, courts consider all four statutory factors, weighing them together rather

than treating them in isolation. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994).

**B.     Eagle Mountain breezes by Bell's blow and delivers a devastating uppercut.**

There is no dispute that Bell owns a copyright or that he attached the allegedly infringing posts to his complaint. Instead, the parties' briefing focuses on whether the posts constitute fair use. *See* MTD; Resp.; Reply. "Fair use is a rule of reason fashioned by Judges to balance the author's right to compensation for his work, on the one hand, against the public's interest in the widest possible dissemination of ideas and information, on the other." *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1174 (5th Cir. 1980) (cleaned up). The Court considers the four fair use factors in turn and finds that Eagle Mountain's posts constituted fair use for the reasons listed below.

    1.     Purpose and character

Under this factor, courts consider the culpability of a defendant's conduct in acquiring or using a work, the extent to which such use is transformative, and whether such use is for commercial or non-commercial purposes. *See Peteski Prods., Inc. v. Rothman*, 264 F. Supp. 3d 731, 736 (E.D. Tex. 2017) ("*Harper & Row* directs courts to consider a defendant's bad faith in applying the first statutory factor.") (citing *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2nd Cir. 2004)); *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 823 (5th Cir. 2002) ("The key question under the 'purpose and character' prong is . . . whether and to what extent the new work is 'transformative.'"); *see also Campbell*, 510 U.S. at 584 ("[T]he commercial or nonprofit educational purpose of a work is . . . one element of the first factor[.]").

Here, Bell alleges **no** facts suggesting that the allegedly infringing posts were made in bad faith or for commercial purposes. Indeed, nothing suggests that Eagle Mountain, a taxpayer funded school district, stood to gain any commercial benefit by sharing these posts whatsoever. Rather, the "allegedly infringing posts" were clearly meant to inspire young, high school softball athletes and color guard members. Further, the posts were mere photographs of the WIN Passage—nothing about them was remotely transformative. *See Veeck*, 293 F.3d at 823 n.48 (suggesting that a use is not transformative if it makes no alteration to or commentary on the underlying work). Bell's punch did not connect. As such, the purpose and character factor weighs in favor of finding fair use.

2.  Nature of the copyrighted work

Courts typically look to two considerations of the work when analyzing the second factor: (1) whether the work is more creative or factual in nature and (2) whether the work is published or unpublished. *Stewart v. Abend*, 495 U.S. 207, 237 (1990) ("In general, fair use is more likely to be found in factual works than in fictional works."); *Cariou v. Prince*, 714 F.3d 694, 709–10 (2d Cir. 2013) ("We consider (1) whether the work is expressive or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower."); *Est. of Barre v. Carter*, 272 F. Supp. 3d 906, 935 (E.D. La. 2017).

Bell published his work in 1982 and the allegedly infringed portion is undeniably factual. It is safe to say that since the beginning of recorded time,[2] it has been axiomatic that athletes must train, that competitions only have one overall winner, and that successful athletes must push harder and further than average to win.[3] *See, e.g.,* VINCE LOMBARDI, GREAT QUOTES FROM GREAT LEADERS 15 (Peggy Anderson ed., 1990) ("The difference between a successful person and others is not a lack of strength, not a lack of knowledge, but rather in a lack of will."); PAUL "BEAR" BRYANT, GREAT QUOTES FROM GREAT LEADERS 119 ("My attitude has always been . . . if it's worth playing, it's worth paying the price to win."). Indeed, as Saint Jerome wisely observed over 1600 years ago, "[n]o athlete is crowned but in the sweat of his brow." SAINT JEROME, LETTER 14 TO

---

[2] As far back as ancient Greece, powerful and successful athletes sought after and displayed might and *arete* (excellence) in the hope of attaining glory. For example, Milo of Croton, the most renowned wrestler of antiquity, lived in the 6th century B.C.E. Modeling himself after the legendary Hercules, he trained tirelessly in innumerable ways (including by carrying an adolescent ox on his shoulders for miles at a time), leading to his becoming an Olympic wrestling champion six years in a row. He also dominated the Pythian Games (7-time winner), Isthmian Games (10-time winner), and Nemean Games (9-time winner). *See* H.A. HARRIS, GREEK ATHLETES AND ATHLETICS 110–13 (1964).

[3] Certainly, Bell does not hold a copyright or monopoly over the ancient code of the athlete. In 1928, General Douglas Macarthur served as President of the American Olympic Committee for the Ninth Olympic Games. In his report to President Calvin Coolidge on America's participation in those games, the General described the code as follows:

> The athletic code, therefore, has come down to us from even before the age of chivalry and knighthood, It embraces the highest moral laws and will stand the test of any ethics or philosophies ever promulgated for the uplift of man. Its requirements are for the things that are right and its restraints are for the things that are wrong. Its observance will uplift everyone who comes under its influence. It instinctively follows a religion that has no hypocrisy in its brave and simple faith and binds man to man in lines as true as steel . . . .

GEN. DOUGLAS MACARTHUR, A SOLDIER SPEAKS: PUBLIC PAPERS AND SPEECHES OF GENERAL OF THE ARMY DOUGLAS MACARTHUR 28 (Maj. Vorin E. Whan, Jr., ed., 1st ed. 1965).

HELIODORUS (c. 373-374) *reprinted in* JOHN BARTLETT, FAMILIAR QUOTATIONS 109 (Emily Morrison Beck ed., Little, Brown & Co., 15th ed. 1980); *accord* GEN. GEORGE S. PATTON, JR., GREAT QUOTES FROM GREAT LEADERS 123 ("Accept the challenges so that you may feel the exhilaration of victory.").[4] This is a devastating blow to Bell and the Court thus finds that this factor weighs heavily in favor of finding fair use.

    3.    <u>Amount and substantiality of copyrighted work</u>

Courts addressing the third factor look to the "quantitative" amount of the copyrighted work used as well as the "qualitative" importance of the portion copied. *Campbell*, 510 U.S. at 584 (noting that the third factor "calls for thought not only about the quantity of the materials used, but about their quality and importance, too"). However, even when only a small portion is copied, "its qualitative nature may weigh against a finding of fair use if it takes the most expressive elements or the heart of a work." *Harper & Row Publishers, Inc*., 471 U.S. at 563. That said, courts recognize that creative works are "closer to the core of intended copyright protection" than are works that are predominantly factual,

---

[4]President Theodore Roosevelt, another pugilist, also preached the virtues of "the Strenuous Life," telling the Chicago Hamilton Club that

> In speaking to you, men of the greatest city of the West, men of the State which gave to the country Lincoln and Grant, men who preeminently and distinctly embody all that is most American in the American character, I wish to preach, not the doctrine of ignoble ease, but the doctrine of the strenuous life, the life of toil and effort, of labor and strife; to preach that highest form of success which comes, not to the man who desires mere easy peace, but to the man who does not shrink from danger, from hardship, or from bitter toil, and who out of these wins the splendid ultimate triumph.

THEODORE ROOSEVELT, *The Strenuous Life, in* 12 THE WORKS OF THEODORE ROOSEVELT IN FOURTEEN VOLUMES 3 (2019).

such as news or non-fiction. *See*, *e.g.*, *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 557 (S.D.N.Y. 2013) (citing *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998)).

Neither Eagle Mountain nor Bell dispute that the sole passage posted constitutes any quantitatively meaningful amount of the copyrighted work—in fact, the posts show a single page of 72-page book. *See* Comp. Exs D, E (showing only page 8 of the work); KEITH BELL, WINNING ISN'T NORMAL (1982) (showing that the work is 72 pages long). The qualitative consideration is slightly less clear. Though Bell claims that the WIN passage constitutes the "heart" of his non-fiction work, he provides nothing beyond that plain, bare assertion. Given the minimal quantitative and questionably qualitative nature of the posting, the Court separates the clinched combatants and finds that the third factor is, at best, neutral.

    4.    <u>Effect of the use on the potential market</u>

Finally, the fourth fair use factor requires courts to consider "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. "Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row Publishers*, 471 U.S. at 566–67. The fourth factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a *substantially adverse impact* on the potential market" for the original. *Campbell*, 510 U.S. at 590 (emphasis added). The fair use analysis, "when properly applied, is limited to

11

copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row Publishers*, 471 U.S. at 568.

Bell pleads **no** facts about any actual lost book sales or other sales after the 2017 tweets or otherwise allege that the tweets in question impacted his actual or potential sales of books. Instead, he merely alleges, without support, that sales "could fall." Comp. at ¶ 40(d). Over three years have passed since the tweets were posted, yet Bell alleges **no** facts whatsoever concerning any impact (much less substantially adverse impact) the tweets had on his book sales during the eleven months that the posts stayed up. Indeed, it begs all credulity to even suggest that two taxpayer funded public high school twitter pages with less than 1,000 followers between them sharing a single page of Bell's published, non-fiction work in a positive manner could somehow have a "substantially adverse impact" on Bell's book market or other sales. *See* Comp. at Exs. D, E. If anything, it could be credibly argued that the school's posting of these inspiring passages might actually *boost* Bell's sales among young athletes, the very audience for his books. Thus, Eagle Mountain slips Bell's punch and the fourth factor favors finding fair use.

C.  **Eagle Mountain wins by a knockout.**

Overall, factors one, two, and four favor finding fair use while factor three is neutral. As such, the Court finds that the posts in question constituted fair use. Eagle Mountain delivered a knockout in this four-round bout and Bell's claim for direct copyright infringement is therefore **DISMISSED with prejudice.**

Further, contributory and vicarious infringement do not exist absent direct infringement by another. *See e.g.*, *Religious Technology Center v. Netcom On-Line*

*Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001). Having found fair use and dismissed Bell's direct infringement claim, his contributory and vicarious infringement claims necessarily fail as well. Thus, Eagle Mountain also obtained a technical knockout and Bell's claims for contributory and vicarious infringement are **DISMISSED with prejudice.**

## UNSPORTSMANLIKE CONDUCT

This Court, like any good referee, does not tolerate unsportsmanlike conduct. According to the Fifth Circuit, "[a]n award of attorney's fees to the prevailing party in a copyright action is the rule rather than the exception and should be awarded routinely." *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 588–89 (5th Cir. 2015) (quoting *Virgin Records Am., Inc. v. Thompson*, 512 F.3d 724, 726 (5th Cir. 2008)). "Pursuant to 17 U.S.C. § 505, a district court may as an exercise of its statutory discretion award attorney's fees and costs to the prevailing party in a copyright infringement suit. Such an award will be reversed only upon an abuse of discretion." *Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 939 (7th Cir. 1993) (citing *Chi–Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1230 (7th Cir. 1991)); *see Hunn*, 789 F.3d at 588–89 (reviewing the district court's grant of attorneys' fees for abuse of discretion). That said, "a district court may not award attorney's fees as a matter of course; rather, a court must make a more particularized, case-by-case assessment." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1985 (2016) (cleaned up).

In *Fogerty v. Fantasy, Inc.*, the Supreme Court listed several non-exclusive factors that a court may consider in exercising its discretion: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." 510 U.S. 517, 534–35 (1994). "Prevailing plaintiffs and prevailing defendants are to be treated alike" in this analysis, *id*. at 534, and the objective unreasonableness factor is given "significant weight." *Kirtsaeng*, 136 S. Ct. at 1989; *see also Bell v. Oakland Cmty. Pools Project, Inc*., No. 19-CV-01308-JST (N.D. Cal. Oct. 14, 2020) (discussing the factors at length in a virtually identical case).

Given that Eagle Mountain is the suit's prevailing party, the Court now considers *Fogerty*'s factors to determine whether to award discretionary attorney's fees under 17 U.S.C. § 505.

**A.     Frivolousness**

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). At a rote, recitation-of-the-elements level, Bell's claims barely clear the edge of this very low hurdle—he holds a copyright and Eagle Mountain did post a picture of copyrighted material without his consent. Thus, although arguably morally questionable, his complaint was not legally frivolous.

**B.     Objective Unreasonableness**

In his complaint, Bell audaciously demanded either "$700 [to] $30,000" or "$200 [to] $150,000" alongside costs and attorneys' fees. Comp. at ¶¶ 44–45. Again, this exorbitant demand was in response to a pair of public high school twitter accounts—with

14

less than 1,000 followers between them sharing a single page of Bell's published, non-fiction work in a manner meant to inspire young student athletes—that immediately removed the posts upon request and engaged in settlement negotiations for over two years before suit. *Id*. The Court strains itself to imagine how such *de minimus* "injury" would be worth anywhere near even the lowest the amounts demanded (in fact, it is easy to imagine that the posts actually *boosted* the WIN Passage's profile and inspired viewers to purchase the work). Engaging a publicly funded school district (and many, many more, *see infra*) in costly litigation over such *de minimus* acts for these disproportionate damages smacks of harassing, indeed unethical, litigation practices. *See Texas Lawyer's Creed—A Mandate for Professionalism*, *reprinted in* TEXAS RULES OF COURT 764 (West 2019) (Texas attorneys are mandated to "advise [] client[s] that [they] will not pursue conduct which is intended primarily to harass or drain the financial resources of the opposing party."). Nevertheless, the case was not legally frivolous for the reasons noted above. Given the mix of factual unreasonableness with legal non-frivolousness, this factor is, at best, neutral.

**C.     Motivation**

"The existence of bad faith or an improper motive in bringing or pursuing an action weighs in favor of an award of fees to a prevailing party." *Phoenix Techs. Ltd. v. VMware, Inc.*, No. 15-CV-01414-HSG, 2018 WL 828030, at *8 (N.D. Cal. Feb. 12, 2018) (quoting *Epikhin v. Game Insight N. Am.*, No. 14-CV-04383-LHK, 2016 WL 1258690, at *6 (N.D. Cal. Mar. 31, 2016)). "Such a finding may be based on actions that led to the lawsuit, as well as on the conduct of the litigation." *Id*. (internal quotation marks and citation omitted). A motive is not improper simply because it is pecuniary. *Id*.

15

Review of the plethora of lawsuits Bell has filed throughout the United States reveals that he "**is in the business of litigation, not protecting [his] copyrights or 'stimulat[ing] artistic creativity for the general public good**.'" *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB SHX, 2015 WL 1746484, at *9 (C.D. Cal. Mar. 24, 2015), *aff'd*, 847 F.3d 657 (9th Cir. 2017) (quoting *Fogerty*, 510 U.S. at 527) (emphasis added). For example, in a recent order imposing attorneys' fees on Bell, the United States District Court of the Northern District of California described Bell as a "professional litigant" who, at the time of that order, "filed over **26** copyright infringement lawsuits since 2006 and obtained settlements from at least **90** different alleged infringers," almost exclusively public school districts and non-profits, "all related to the WIN passage" *Oakland Cmty. Pools Project,* at 6 (emphasis added).

In the California case, Bell sued the Oakland Community Pools Project ("Oakland"), a non-profit dedicated to introducing disadvantaged children to swimming, over a twitter post that included the WIN Passage—a fact pattern virtually identical to the case at bar. *Id*. at 1. There, Bell boldly demanded that Oakland pay him **$25,000** to release it from liability or, alternatively, to turn the case over to a commercial insurance carrier. *Id*. at 5. An expert in *Oakland* valued Bell's claim at **$12.83**, constituting a **$24,987.17** difference between the amount sought and the amount the claim was actually worth—well over a **194,500% markup**. *Id*. at 6 (emphasis added). In response, Oakland argued that Bell was improperly motivated by forcing it to choose "between spending money to defend [that] case or paying Bell off in a disproportionate settlement." *Id.* (cleaned up). In other words, Oakland asserted that it was the victim of a classic legal shakedown. The district

court agreed, finding Bell liable for Oakland attorney's fees and costs in the amount of $122,101.65. *Id.* at 13.

Similarly in *Bell v. Granite School District*, No. 2:19-CV-00209-DBB (D. Utah 2019), Bell sued another public school district merely for reading an excerpt from WINNING ISN'T NORMAL at a sports awards banquet! *See Granite School District* Comp., ECF No. 2. In the end, *Granite School District* concluded in a settlement for $600 and an agreement where the school district would refrain from using Bell's phrase going forward. *See Oakland Cmty. Pools Project* Mt. for Atty's Fees, ECF No. 68-11 at 6–7 (detailing Bell and Granite School District's settlement agreement found via Utah's public record laws). One must assume that it did not take much coercion for the school district to agree never to inadvertently use Bell's work again.

The *Oakland* and *Granite School District* cases are only two illustrations of Bell's general litigation strategy, which "appears to be to demand an immediate settlement . . . for an amount that is just cheap enough to discourage the defendant from mounting a fair use defense." *Oakland Cmty. Pools Project,* at 6. The Court is left to the unavoidable conclusion in this case that Bell continues to insist on extorting public schools by abusing the Copyright Act in precisely the way he did to the non-profit and public school in *Oakland*, *Granite School District*, and many other cases. Such unsportsmanlike behavior will not be tolerated. As the *Oakland* court aptly noted, "[t]he fact that a copyright is frequently infringed does not invalidate its holder's attempts to enforce it. Nor does a copyright plaintiff's desire to obtain compensation for their work render their motive in

17

bringing an infringement claim improper." *Id*. (citing *Phoenix Techs*., 2018 WL 828030, at *8).

Abraham Lincoln observed that "[w]hat kills a skunk is the publicity it gives itself." *Great Quotes from Great Leaders* 21. Here, as in many of Bell's other cases, the issue is not that he seeks to enforce his copyright but that he seeks a disproportionate amount to settle his claims in a repulsively pungent pattern that repeats tens, if not hundreds, of times over. *Oakland Cmty. Pools Project,* at 6. "Leveling exorbitant settlement demands at nonprofits and public schools does not advance the purposes of the Copyright Act." *See id.* at 7 (citing *AF Holdings LLC v. Navasca*, No. C-12-2396 EMC, 2013 WL 3815677, at *2 (N.D. Cal. July 22, 2013) (finding improper motive where plaintiff "does not appear to have been motivated to file suit in order to protect the copyrighted work at issue" but rather "to coerce settlements")). Accordingly, the Court finds that this factor weighs in favor of fee shifting. *See Perfect 10*, 2015 WL 1746484, at *9–11 (finding improper motive where plaintiff filed 20 to 30 copyright infringement suits and settled or obtained default judgments in all of them).

### D.    Compensation and Deterrence

When evaluating the compensation and deterrence factor "in the context of a successful defendant, courts must be careful not to 'discourage starving artists from defending copyrights in original works due to the threat of attorney's fees.'" *Id.* at *12 (internal quotation marks omitted) (quoting *Brod v. Gen. Publ'g Grp., Inc*., 32 F. App'x 231, 236 (9th Cir. 2002)). Here as in *Oakland*, the Court's finding that Bell's motivation stems from a desire to extract disproportionate settlements rules out the possibility that he

is a "starving artist" whose legitimate enforcement efforts risk being deterred by an award of fees. This applies doubly so in this case, where Bell seeks to drain the coffers of taxpayer funded public school systems that already struggle to stay afloat. Accordingly, this factor weighs in favor of fee shifting. *See Oakland Cmty. Pools Project*, at 9 (citing *Perfect 10*, 2015 WL 1746484, at *12 ("In light of [plaintiff's] well-documented improper motive in bringing suit . . . the Court has little concern that an award of attorneys' fees in this action will discourage 'starving artists' from protecting their copyrights. If anything, it will discourage serial litigants from bringing unmeritorious suits and then unnecessarily driving up litigation costs in order to drive a settlement."); *AF Holdings*, 2013 WL 3815677, at *3 ("[T]here is a strong argument in favor of awarding fees as a deterrent, both with respect to [plaintiff] and other persons or entities that might contemplate a similar business model that is not intended to protect copyrighted work but instead designed to generate revenues through suits and coerced settlements.")).

For these reasons, the Court will award Eagle Mountain costs and attorneys' fees as to Bell's copyright infringement claims. These costs and attorneys' fees shall be extracted solely from Bell, not his counsel. Hopefully, this will serve as a "teaching moment" for Bell. For the survival of the sport, even the most punch-drunk boxers must understand that unsportsmanlike conduct and violations of the rules cannot and will not be tolerated.

## POST-FIGHT ANALYSIS

For the foregoing reasons, the Court finds that Eagle Mountain's Motion to Dismiss (ECF No. 9) should be and hereby is **GRANTED.** Accordingly, Bell's claims against Eagle Mountain are **DISMISSED with prejudice.**

Furthermore, it is **ORDERED** that Eagle Mountain submit a motion with supporting evidence as to its attorneys' fees **on or before April 2, 2021.** Bell shall respond **on or before April 9, 2021.** Should Eagle Mountain wish to reply, it shall do so **on or before April 14, 2021.**

**SO ORDERED** on this **26th day** of **March, 2021.**

_____
Mark T. Pittman
UNITED STATES DISTRICT JUDGE