**FILED**

**March 21, 2022**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 25, 2022

Lyle W. Cayce
Clerk

No. 21-10504

---

Doctor Keith Bell,

*Plaintiff—Appellant,*

*versus*

Eagle Mountain Saginaw Independent School District,

*Defendant—Appellee.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:20-CV-1157-P

---

Before King, Costa, and Willett, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

Just as famous as some great upsets in sports history are the motivational speeches that inspired them. Knute Rockne, in a speech immortalized in film by a future President, asked his Notre Dame players at halftime to "win one for the Gipper." They did just that, rallying to beat an undefeated Army. *See* Knute Rockne: All American (Warner Bros. 1940). Herb Brooks convinced a group of American college players that for one night they could be "the greatest hockey team in the world." They were, defeating the mighty Soviets in the Miracle on Ice. *See* Miracle (Walt Disney Pictures 2004).

Technology now allows inspirational messages to be conveyed not only in the locker room but also on social media. The softball team and flag corps at a public high school outside Fort Worth used their Twitter accounts to post a motivational passage from sports psychologist Keith Bell's book, *Winning Isn't Normal*.

We do not know if the tweets motivated the students to perform at a higher level. We do know that the tweets resulted in Bell's suing the school district for copyright infringement. We must decide if the tweets were a fair use of the copyright that bars this suit.

I

In 1982, Bell published *Winning Isn't Normal*, a 72-page book that provides strategies for success in athletics. Bell continues to market and sell *Winning Isn't Normal* through online retailers and his personal website, where he also offers merchandise, including t-shirts and posters that display the passage that was quoted in the tweets.

That passage, which Bell calls the WIN Passage, is separately copyrighted. Bell offers licenses for its use. The passage reads:

> Winning isn't normal. That doesn't mean there's anything wrong with winning. It just isn't the norm. It is highly unusual.
>
> Every competition only has one winner. No matter how many people are entered, only one person or one team wins each event.
>
> Winning is unusual. And as such, it requires unusual action.
>
> In order to win, you must do extraordinary things. You can't just be one of the crowd. The crowd doesn't win. You have to be willing to stand out and act differently.
>
> Your actions need to reflect unusual values and priorities. You have to value success more than others do. You have to want it more. Now take note! Wanting it more is a decision you make and act upon—not some inherent quality or burning

inner drive or inspiration!  And you have to make that value a
priority.

You can't train like everyone else.  You have to train more and
train better.

You can't talk like everyone else.  You can't think like everyone
else.  You can't be too willing to join the crowd, to do what is
expected, to act in a socially accepted manner, to do what's
"in."  You need to be willing to stand out in the crowd and
consistently take exceptional action.  If you want to win, you
need to accept the risks and perhaps the loneliness . . .
BECAUSE WINNING ISN'T NORMAL!

Bell has another revenue stream.  He zealously seeks out and litigates
unauthorized uses of the WIN Passage.  Between 2006 and 2017, Bell filed
over 25 copyright lawsuits.  Most of the defendants were public schools or
nonprofits, which published the WIN Passage on social media.

In December 2017, Chisholm Trail High School's softball team and
color guard posted the WIN Passage to their Twitter accounts.  The posts
credited Bell as the author but did not include a copyright watermark that
Bell imprints on his own digital reproductions of the WIN Passage. No one
at the school sought Bell's permission before publishing the tweets.  Bell
discovered them through online searches soon after they were posted.

Yet Bell waited almost a year—until November 2018—to notify the
school district that two of its social media accounts had infringed his
copyrights.  The district promptly removed both posts, told Bell that the
mistake was a "teachable moment," and announced it was implementing a
training program to avoid similar incidents.

After settlement negotiations broke down, Bell sued for copyright
infringement.  Recognizing that the suit would turn on whether the tweets
were fair use, Bell addressed the affirmative defense in his pleadings.  The
complaint devotes a paragraph to each of the four fair-use factors.

The school district invoked fair use in moving to dismiss the case for failure to state a claim. The district court granted the motion and also awarded attorney's fees to the defendant.

## II

To survive a Rule 12(b)(6) motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining whether a claim is plausible "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

The failure-to-state-a-claim inquiry typically focuses on whether the plaintiff plausibly alleges the elements of a claim. But Rule 12(b)(6) dismissal may also "'be appropriate based on a successful affirmative defense' provided that the affirmative defense 'appear[s] on the face of the complaint.'" *Basic Cap. Mgmt. v. Dynex Cap., Inc.*, 976 F.3d 585, 588 (5th Cir. 2020) (quoting *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006)). In this situation, it must be apparent from "the plaintiff's own allegations" that a defense is fatal to the claim. *See* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2021). In other words, the pleadings must "reveal beyond doubt that the plaintiffs can prove no set of facts" that would overcome the defense or otherwise entitle them to relief. *Garrett v. Commonwealth Mortg. Corp.*, 938 F.2d 591, 594 (5th Cir. 1991). A claim suffering from this kind of facial deficiency warrants dismissal because it has "a built-in defense and is essentially self-defeating." *Id.* (quotation omitted). Courts thus grant Rule 12(b)(6) motions when the pleadings demonstrate that the plaintiff cannot overcome affirmative defenses such as absolute and qualified immunity, statute of limitations, statute of frauds,

laches, or *res judicata*.   *See* Daniel R. Coquillette et al., 2 Moore's Federal Practice – Civil § 12.34[4][b] (3d ed. 2021); *see, e.g.*, *Basic Cap. Mgmt.*, 976 F.3d at 590–93 (granting a motion to dismiss on both limitations and preclusion grounds).

III

In the copyright realm, fair use is an affirmative defense that can support Rule 12(b)(6) dismissal. *Marano v. Metro. Museum of Art*, 472 F. Supp. 3d 76, 82 (S.D.N.Y. 2020), *aff'd*, 844 F. App'x 436 (2d Cir. 2021); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 692 (7th Cir. 2012); *cf. Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009) (dismissing trademark claim on fair-use grounds).   Indeed, the leading treatise on fair use observes that "[i]ncreasingly, courts have considered fair use on a [R]ule 12(b)(6) motion to dismiss for failure to state a claim." William F. Patry, Patry on Fair Use § 7:5 & n.10 (2017) (citing more than 25 cases that have evaluated fair use at the Rule 12 stage).

While the fair use defense is usually teed up at summary judgment, we can resolve it on the pleadings if the complaint contains "facts sufficient to evaluate each of the statutory factors." *See Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 560 (1985).   When discovery is needed to flesh out how these factors tilt, a ruling at the pleading stage is premature.   But as with other affirmative defenses, if the complaint sets forth all the ingredients of a successful fair-use defense, discovery is unnecessary. *See Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986).   And delayed recognition that the plaintiff cannot plausibly recover prevents dismissal "at the point of minimum expenditure of time and money by the parties and the court." *See Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 558); *see also Brownmark*, 682 F.3d at 691, 694 (disposing of a copyright claim on fair-use grounds prior to financially "[r]uinous discovery").

Our question, then, is whether a successful fair-use defense appears on the face of Bell's complaint.

The fair-use doctrine balances the "inherent tension" between copyright's interests in protecting author's works and permitting others to reference them in cultural conversation. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994). Because the overarching goal of copyright is to stimulate intellectual activity for the public good, *id.*, courts have long recognized a "limited privilege in those other than the owner of a copyright to use the copyrighted material in a reasonable manner without the owner's consent." *Fisher*, 794 F.2d at 435. This privilege applies when "rigid application of the copyright statute" would "stifle the very creativity" it is meant to foster. *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (quotations omitted).

Congress codified the fair-use doctrine in the Copyright Act of 1976 and listed four factors that courts should consider when applying it:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The four factors are not exclusive. *Harper & Row*, 471 U.S. at 560. "All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. A fair-use defense can succeed even if one or more factors favor the claimant. *See id.*; *Compaq Comput. Corp. v. Ergonome Inc.*, 387 F.3d 403, 409–10 (5th Cir. 2004). Courts typically give particular attention to factors one and four (the purpose and market effect of the use). *See Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1171 (9th Cir. 2012); Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use*

*Opinions, 1978–2005*, 156 U. Pa. L. Rev. 549, 584 (2008) (finding that "the outcomes of factors one and four very strongly correlated with the test outcome" in a survey of caselaw). But, ultimately, courts have "almost complete discretion in determining whether any given factor is present in any particular case" and whether the totality favors fair use. *See* Melville B. Nimmer & David Nimmer, 4 Nimmer on Copyright § 13.05(A)(4) (Matthew Bender rev. ed. 2021).

### A

The first factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This involves a few considerations. The first and most obvious is commerciality—"whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *See Harper & Row*, 471 U.S. at 562. The second is whether the user acted in good faith. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1204 (2021); *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2d Cir. 2004). The third is whether the use is "transformative," meaning it "adds something new" to the copyrighted work. *Google*, 141 S. Ct. at 1203. The school district does not assert that its use was transformative but argues the other inquiries tip the first factor in its favor. We agree.

First, the school's use was noncommercial. Nothing in Bell's complaint indicates that the public school district profited by posting a one-page excerpt of Bell's book on Twitter. Indeed, it is hard to imagine how the school could derive a commercial benefit from that use.[1] The tweets' only

---

[1] The school district did not, for example, charge others to access the WIN Passage, *cf. Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 628 (9th Cir. 2003), or pawn the work off as its own, *Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1176 (5th Cir. 1980). Nor did it reproduce a substantial portion of *Winning Isn't Normal* to save its students the cost of purchasing the book. *Cf. Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2010).

conceivable motivation was to inspire students to strive for success. Indeed, the pleadings show that the school's Twitter accounts routinely tweeted similar motivational messages to students, such as "Color guard!!! . . . . don't stop until you're PROUD." In Rule 12 lingo, this means any commercial benefit is implausible.

Bell argues that the tweets could indirectly benefit the school by bolstering the "professional reputation" of its athletics programs. Enhanced reputation can be a commercial benefit, such as when a scientist falsely presents another's article as her own. *See Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989). That is because scientists are judged by the quality of their research, so a scientist who takes credit for another's good work enhances her professional status and likely her salary down the road. *Id.* (recognizing that "profit is ill-measured in dollars" in academia because public recognition is what "influences professional advancement and academic tenure"). That rationale does not apply to the tweets of Chisholm Trail High's softball team and color guard. The tweets did not tout the successes of those programs or bring tales of their fame and glory to the outside world. The tweets attempted to motivate the student members to perform at their best, not to motivate donors to contribute to the programs. There is no logical theory for how tweeting Bell's motivational message to inspire students would enhance the reputations of these programs, let alone how that might lead to some tangible benefit for the school district later on.

The complaint thus does not plausibly allege that the school district profited from its use of Bell's work. With this first consideration, the district takes the lead. *See Google*, 141 S. Ct. at 1204 ("There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use.").

The school's good faith adds another point to the scorecard. *See Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000). Good faith does not excuse infringement. *See id.* Nevertheless, because "fair use

presupposes good faith and fair dealing," the propriety of the defendant's conduct does factor into "the equitable balance of a fair use determination." *Fisher*, 794 F.2d at 432 (quoting *Harper & Row*, 105 S. Ct. at 2232). The school posted the WIN Passage in quotes and credited Bell as the author. *See Nunez*, 235 F.3d at 23. Bell discovered the posts soon after but waited nearly a year before telling the school he disapproved of them.[2] Once he did, the school immediately removed the posts and responded that the incident was "a teachable moment" it would be sure not to repeat. We do not see anything in the school's conduct "sufficiently blameworthy" to weigh against fair use. *See id.*

Bell insists that the first factor still weighs against fair use because the school's use was not transformative. But "transformative use is not absolutely necessary for a finding of fair use." *Campbell*, 510 U.S. at 579. It just strengthens the claim to fairness. If expression is not transformative, "other factors, like the extent of its commerciality, loom larger" and require a stronger showing. *Id.* at 580. As a result, even though the school's use here was not transformative, the first factor weighs for Eagle Mountain because its use was in good faith and did not produce a commercial benefit.

## B

The second statutory factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). "In general, fair use is more likely to be found in factual works than in fictional works." *Abend*, 495 U.S. at 237. To determine the nature of the work, we consider whether the work has been appropriated for its "expressive elements," rather than to disseminate "the underlying facts." *Harper & Row*, 471 U.S. at 563–64. We also consider whether the

---

[2] Courts also look at the propriety of the plaintiff's conduct when assessing good faith. *See, e.g.*, *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1122 (D. Nev. 2006) (considering both defendant's good faith in promptly removing the infringing content and plaintiff's bad faith in ginning up the litigation); *Rubin v. Brooks/Cole Pub. Co.*, 836 F. Supp. 909, 918 (D. Mass. 1993).

work has been published, as the scope of fair use is "narrower with respect to unpublished works." *Id.* There is no dispute that Bell's work is published. The only question, then, is whether the work is factual.

*Winning Isn't Normal* is a nonfiction study of athleticism, "based on psychological principles" derived from Bell's work in the field. Bell admits that the book is "factual" in nature. He alleges, however, that the WIN Passage is not "purely factual" because it articulates facts in a "motivational and expressive" way.

Construing the pleadings in Bell's favor as we must, the WIN Passage is somewhat creative. The passage largely consists of well-worn truisms: "Every competition only has one winner. . . . You can't just be one of the crowd. . . . You have to train more and train better." Athletes will be familiar with them all. Still, Bell is entitled to the inference that the school chose the WIN Passage because it combines and condenses these principles in a particularly inspiring way. *See Harper & Row*, 471 U.S. at 564.

The second factor goes to Bell. But it is a meager victory. The nature of the work is widely considered the least significant fair-use factor. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997); Patry § 7:5. And Bell carries it by a narrow margin.

## C

The third fair-use factor examines "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). We consider whether the amount copied is either a quantitatively or qualitatively significant part of the original. *See Campbell*, 510 U.S. at 586–87. Even a relatively small amount of copying can weigh against fair use if it captures "the heart" of the work. *Harper & Row*, 471 U.S. at 565.

Bell alleges that "the WIN Passage is only one page out of 78 pages in *Winning Isn't Normal* but is plausibly 'the heart of the work.'" That may be

true.  The complaint notes that "Dr. Bell sells merchandise featuring the WIN Passage" and readers "find it moving enough to share with others on Twitter."  It would be reasonable to infer from these facts that the WIN Passage is a key element of *Winning Isn't Normal*— maybe even the essence of Bell's book.[3]

If that were all, copying the WIN Passage would be qualitatively significant.  The pleadings, however, also indicate that the WIN Passage was freely accessible before the softball team and flag corps posted it.  The WIN Passage appears in images that Bell posts online.  Indeed, the complaint suggests that Bell merely took issue with the post because it "was not the generally circulated version."  If an infringing use "enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced . . . does not have its ordinary effect of militating against a finding of fair use."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449–50 (1984).  The school quoted a small excerpt from *Winning Isn't Normal*, which was already freely available to the public.  As a result, the third factor is neutral.

## D

The fourth factor examines "the effect of the use" on the market for and value of the copyrighted work.  17 U.S.C. § 107(4).  We consider actual market harm but, more broadly, whether widespread use of the work in the same infringing fashion "would result in a substantially adverse impact on

---

[3] Because the WIN Passage is plausibly the heart of *Winning Isn't Normal*, we need not consider Bell's alternative argument that the WIN Passage should be treated as a separate work.

the potential market" for the original work and any derivatives.[4] *Campbell*, 510 U.S. at 590; *see also Compaq*, 387 F.3d at 410.  "This last factor is undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566.

Bell does not allege that he actually lost any revenue due to the school's use of the passage.  Instead, his complaint contends that widespread use of the WIN Passage on social media could reduce "the incentive to purchase *Winning Isn't Normal* or related merchandise."

We do not see a plausible economic rationale to support Bell's assertion that widespread tweeting of the WIN passage would undermine the value of his copyright. *See Twombly*, 550 U.S. at 566–68 (considering market realities in evaluating whether a claim is plausible).  The tweets do not reproduce such a substantial portion of *Winning Isn't Normal* "as to make available a significantly competing substitute" for the original work.  *See Author's Guild*, 804 F.3d at 223.  If anything, the properly attributed quotation of a short passage from *Winning Isn't Normal* might bolster interest in the book; it is free advertising. *See Narell v. Freeman*, 872 F.2d 907, 914 (9th Cir. 1989).  The same is true for merchandise.  An online post is not a market substitute for a coffee mug.  Viral sharing of the WIN Passage on Twitter might enhance the notoriety and appeal of Bell's work, thereby increasing the incentive to purchase products displaying it.  The opposite inference does not make sense: How would online references to the WIN Passage reduce the market for merchandise displaying it?

---

[4] The school district asserts that Bell carries the burden on this factor because its use was not commercial.  Although some courts once interpreted *Sony* as creating a presumption of *de minimis* harm for nonprofit uses, *see e.g.*, *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385–86 (6th Cir. 1996), the Supreme Court has since clarified that no such presumption exists, *see* Patry § 6:4 ("[T]he burden of proving the defense always remains on the party asserting it."); *Campbell*, 510 U.S. at 584–85; *Harper & Row*, 471 U.S. at 566–69.

Bell also alleges that the tweets might impact his ability to license similar uses of the WIN Passage.  But we cannot recognize a "theoretical market for licensing the very use at bar." *Swatch Group Mgmt. Servs., Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) (quoting 4 NIMMER ON COPYRIGHT § 13.05(A)(4).  To weigh any possible effect on licensing, we must first find it plausible that there is a "traditional, reasonable, or likely to be developed market[]" for licensing the kind of use at issue.  *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994); *see also Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014) (finding that the availability of licenses for the plaintiff's copyrighted work "is not determinative" of a potential market for licensing the defendant's use).  Bell says he offers licenses for the WIN Passage.  Yet despite being embroiled in litigation for years, Bell is unable to allege that anyone has ever purchased a license before posting the WIN Passage on social media—much less a public school district, which has no commercial interest in its online presence.  Even in his brief, Bell's only authority that "such a market exists" is his own "filing of at least 26 copyright infringement lawsuits" and obtaining settlements "from at least 90 different alleged infringers."  Bell's aggressive efforts to litigate, no matter how successful, are not indicative of a "traditional" or "reasonable" market for his work.  *See Hofheinz v. AMC Prods., Inc.*, 147 F. Supp. 2d 127, 141 (E.D.N.Y. 2001) (explaining alleged infringers "are likely to seek a license to avoid entering the murky realm of fair use law during the course of litigation").  Absent any plausible allegation that public schools would willingly pay to tweet the WIN Passage, Bell's licensing concerns "are purely speculative." *See Narell*, 872 F.2d at 914.

Bell has failed to plausibly allege a "substantially adverse impact" on a legitimate market for his copyrighted work.  The fourth factor thus weighs in favor of fair use.

E

Time to tally up the scorecard.  The first and fourth fair-use factors favor the school district, the second narrowly favors Bell, and the third is neutral.  In both their number and importance, the statutory factors show that the school's tweets were fair use.  This conclusion comports with the "ultimate test of fair use": whether copyright law's goal of promoting creativity would be better served by allowing the use than preventing it. *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998).  The complaint does not suggest that the school's use had any cognizable, adverse impact on Bell.  What it does make clear is that the softball team and flag corps used Bell's work in good faith, for no commercial gain, and for the laudable purpose of motivating students to succeed.  We cannot see how the creative arts would be better served by permitting Bell's suit to proceed.  Because a successful fair-use defense "appears on the face of the complaint," and Bell can "prove no set of facts" that would overcome it, the district court properly dismissed the case.  *See Garrett*, 938 F.3d at 594.

IV

Bell also challenges the district court's award of attorney's fees.  We review this ruling only for abuse of discretion.  *See Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 588 (5th Cir. 2015).

"[A]ttorney's fees to the prevailing party in a copyright action is the rule rather than the exception and should be awarded routinely." *Virgin Records Am., Inc. v. Thompson*, 512 F.3d 724, 726 (5th Cir. 2008) (quotation omitted).  Still, "recovery of attorney's fees is not automatic." *Id.*  It is a matter of the district court's discretion. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994).  Relevant factors include: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 539 n.19 (quotation omitted).

The district court did not abuse its discretion by following the normal rule. Bell is not the typical copyright plaintiff seeking "a fair return for [his] creative labor." *See Twentieth Cent. Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). He has a long history of suing public institutions and nonprofit organizations over *de minimis* uses of his work.[5] Taking these cases into account, the district court reasonably concluded that Bell is a serial litigant, who makes exorbitant demands for damages in hopes of extracting disproportionate settlements. This case is another in the line. The school shared a single page of Bell's work with fewer than 1,000 online followers and immediately removed the posts upon request. Bell was unable to identify any actual financial injury associated with that use but brought suit anyway. Attorney's fees were thus an appropriate deterrent, both with respect to Bell and other copyright holders who might consider a similar business model of litigation. *See id.* at 618.

\*\*\*

The judgment is AFFIRMED.

---

[5] *See e.g.*, *Bell v. Worthington City Sch. Dist.*, 2020 WL 2905803, at \*3 (S.D. Ohio June 2, 2020) (tweet by a high-school basketball coach); *Bell v. Llano Indep. Sch. Dist.*, 2020 WL 5370591, at \*1 (W.D. Tex. Feb. 13, 2020) (same); *Bell v. Oakland Cmty. Pools Project, Inc.*, 2020 WL 4458890, at \*1 (N.D. Cal. May 4, 2020) (tweet by a non-profit aquatics center for disadvantaged youth); *Bell v. Granite Sch. Dist.*, No. 2:19-CV-00209-DBB (D. Utah 2019) (reading the WIN Passage at a public school's sports awards banquet).